UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                           Criminal Case Number 24-20083
                                           Honorable David M. Lawson

TYRESE JOHNSON,

                Defendant.

_____/

## OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO DISMISS INDICTMENT

Detroit police officers arrested defendant Tyrese Johnson during a traffic stop in a city neighborhood last December. He allegedly possessed a machinegun at the time, and he was indicted by a grand jury for unlawfully possessing that weapon in violation of 18 U.S.C. § 922(o). Johnson has filed a motion to suppress both the evidence seized during that traffic stop and a statement he made to police before he was given his *Miranda* warnings. He also filed a motion to dismiss the indictment, arguing that section 922(o) is repugnant to the Second Amendment. The Court held an evidentiary hearing on September 12, 2024 and heard oral argument on the motions. Because Johnson's conduct during the traffic stop permitted the police to detain and search him consistent with the Fourth Amendment, and because Johnson's statement was not the product of police interrogation, the motion to suppress that evidence will be denied. The defendant's conduct does not fall within the plain meaning of the Second Amendment, and section 922(o) is consistent with the Nation's historical tradition of firearm regulation; therefore it is not unconstitutional on its face or as applied to Johnson. Therefore, the motion to dismiss the indictment will be denied.

I.

Johnson is charged in a one-count indictment with possession of a machinegun in violation of 18 U.S.C. § 922(o).  On December 6, 2023, at approximately 10:30 p.m., Sergeant Jordan Leavy and Officer Quinten Moten of the Detroit Police Department were on patrol in a neighborhood on the City's East side when they spotted a red Saturn Vue driving the wrong direction on a one-way street.  Detroit Police Report, ECF No. 35-2, PageID.132.

Moten testified at the hearing that his police vehicle was equipped with a dash camera, and he and his partner wore body cameras.  Footage from those devices was received in evidence at the hearing.

Leavy, who was driving, initiated the traffic stop of the Saturn for driving in the wrong direction.  Leavy approached the Saturn on the driver's side, and Moten approached the passenger side.  A woman was in the driver's seat, a person eventually identified as the defendant was in the passenger seat, and another male was in the back seat behind the driver.  Leavy told the occupants to roll down their windows.  The defendant did not comply.

Leavy asked for the driver's operator's license, car registration, and proof of insurance. She acknowledged the traffic infraction after expressing surprise, and she produced the documents. The defendant reached into the glove compartment to help her find the registration and insurance document.  Leavy noticed that the proof of insurance had expired, and he returned to the police vehicle to run a check on the driver and the vehicle.  Leavy testified that he did not feel unsafe, and no one was ordered to exit the vehicle at that time.

Meanwhile, from his vantage point on the passenger side, Moten observed the defendant leaning forward from his seatback as if to conceal something.  He testified that he thought he recognized the defendant from an encounter a few months earlier (September of that year) in the

Ninth Precinct.  At that time, a vehicle with five occupants was stopped.  Two or three weapons were recovered, and the driver was charged with a firearm offense.  However, the defendant was not armed or arrested during that encounter, although Moten recalled that the defendant taunted him and was disrespectful.

Moten remained at the passenger door while Leavy dealt with the driver.  After Leavy returned to the police vehicle to look up records on the driver and the Saturn, Moten walked back to the police vehicle, where the body camera audio captures Moten's statement that he recognized the defendant from the encounter in September.  He shared his hunch with Leavy that the defendant was armed.  Moten wanted to look further, but Leavy told him that the defendant could refuse to get out of the car.  Both Moten and Leavy acknowledged that they had no "PC," that is, probable cause, to search the car or the defendant.  In fact, at the initial stop, Leavy had asked the driver for permission to search the car, and she politely refused.

Leavy finished his record query and confirmed that the Saturn was insured.  But when Moten shared his hunch, Leavy called for a backup unit and Moten returned to the Saturn, where he tried to engage with the defendant.  Moten shined his flashlight into the car but saw no weapons or contraband.  Moten testified that he thought the defendant was nervous, although the body camera footage does not confirm that characterization.  Moten then can be heard shouting "furtive movement," but again, the camera footage does not show any movement at all.  Moten asked the defendant to get out of the car; he refused.  Moten asked the defendant his name, speaking to him through the rear passenger window — the front passenger window remained closed — and the defendant responded that his name was Tyrese.  Moten asked for identification, and the defendant told him he had none.

By then Leavy had returned to the Saturn and handed the driver her documents and told her that her "stuff is good."  Eventually, the driver was able to locate a current proof of insurance on her cell phone.  He then asked the defendant if he had yet provided his name to Moten.  The defendant replied that he had.  Moten interjected to tell Leavy that the defendant would not come to the officers' vehicle.  This prompted a confused back-and-forth with the defendant and the driver about whether the defendant had sufficiently answered the officers' queries.  Moten asked the defendant two more times, to get out of the car, "negotiating" with him to exit the Saturn.  The defendant refused, arguing that he did not have to comply, reiterating that there was nothing of concern in the car and that he did not want to leave the vehicle because it was cold, and stating that he wanted to protect his rights.

By that time, a backup unit arrived with Officers Mitchell Griggs and Dwayne Toney.  Moten then ordered the defendant out of the car.  Moten stepped aside to tell Toney why he was interested in investigating the defendant.  Meanwhile, on the driver's side of the vehicle, Griggs informed the defendant that the officers lawfully could order him from the vehicle without providing a reason.  The defendant continued to protest, and Leavy warned him that the officers would use force to remove him from the car if necessary.

At that point, Griggs moved to the passenger side of the vehicle and asked Moten whether the passenger door was locked.  Griggs inserted his hand through the open rear passenger window in an apparent attempt to unlock the car.  As Griggs reached into the vehicle, Moten told him that the defendant was about to "pull off."  The video depicts the defendant clutching Griggs's hand on the lock mechanism and struggling to prevent him from opening the door.  This prompted Griggs to state that the defendant had "messed up."  The defendant then appears to turn away from the door and grab the car's gearshift in the center console with his left hand.  He demanded that

the driver put her foot on the brake pedal, presumably so the shifter could engage.  Moten shouted, "They about to pull off."  Leavy testified that the defendant actually succeeded in putting the car in "drive," and he had to tell the driver to put the car in "park."

At the same time, Griggs, who had extricated his arm from the Saturn, reached into the car again to deploy his pepper spray.  Moten shifted to the back passenger window and continued to struggle with the defendant to open the door.  Griggs approached the passenger front door and used a tool to break the window.  The defendant then exited the vehicle toward the officers, who restrained him.

In the commotion, one of the officers announced that he saw a gun under the defendant's jacket, and Moten moved quickly to grab it.  According to the officers' after-action report, they recovered a loaded Polymer 80 PF940SC 9mm handgun equipped with a machinegun conversion device from the defendant's pocket.  The officers restrained the defendant and placed him in the back of their patrol vehicle.

Nothing in the record suggests that the officers provided the defendant his *Miranda* rights at the scene.  While restrained in the police vehicle, Johnson shouted for several minutes, making profanity-laced comments about the officers, complaining about their conduct, and admitting that he recognized Moten and another arresting officer from the prior encounter.  *See* ECF No. 35, PageID.122 ("Johnson: . . . Same two n****s I was talkin' to last time.  I know you remember, bro.  Same two n****s I was talking crazy to y'all just like this last time.  You remember. I don't like you, bro.  I ain't gonna lie, bro.  I don't like you.").

The defendant does not contest the validity of the initial traffic stop.  However, in his motion to suppress evidence, he maintains that the officers exceeded the scope of the initial stop to investigate him and that they needed reasonable suspicion to do so, which was lacking.  He says

that everything that flowed from there was tainted by this Fourth Amendment violation.  He also argues that his statements to the officers are independently suppressible because they were obtained in violation of the Fifth Amendment.

The government responds that the police officers had authority to order the defendant to exit the vehicle following a valid traffic stop.  When he refused, the government says, there was probable cause to arrest and search him for resisting a lawful police order.  Alternatively, the government argues that Officer Moten had reasonable suspicion to investigate the defendant, and that gave him the authority to detain and search him.  Finally, the government argues that even if the stop violated the Fourth Amendment, Johnson's own actions amounted to assault on the officers and were an intervening event that purged any taint from the previous events.

II.

Defendant Johnson bases his argument on the Fourth Amendment, which prohibits "'unreasonable searches and seizures.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV).  It is generally understood that a search is "unreasonable" "if it is not conducted pursuant to a warrant issued upon probable cause." *Ibid.* (citing *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528-29 (1967)). Equally well established is the rule that "[a] warrantless search or seizure is *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *King v. United States*, 917 F.3d 409, 422 (6th Cir. 2019) (quotations omitted).

One of those exceptions allows a traffic stop when a police officer has reasonable suspicion of an ongoing crime or a completed felony or when he has probable cause to believe that a civil traffic violation has been committed.  *United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007).  And "[a]n officer may detain an individual for a short time for investigatory purposes if,

- 6 -

under the totality of the circumstances, [he] has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts.'"  *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012); citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

*The traffic stop.*  During the traffic stop, Johnson repeatedly asserted that the officers had no reason to direct him to leave the vehicle as he was merely a passenger.  That is not a correct statement of the law.  When stopped, both the driver and a passenger of a vehicle are "seized," and the protections of the Fourth Amendment attach.  *See Brendlin v. California*, 551 U.S. 249, 255 (2007).  However, the Supreme Court has held that officers may order both drivers *and passengers* to exit the vehicle.  *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").  This authority largely is derived from the inherent risks to the safety of officers posed by traffic stops.  *Id.* at 413-14.

But this is not the argument Johnson asserts here.  He contends that the officers ordered him from the vehicle *after* they had concluded the business attendant to their initial reason for the stop.

The Sixth Circuit and Supreme Court both have explained that a lawful traffic stop must "be limited in scope and duration."  *United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  "If an officer exceeds the scope or duration of the traffic stop, he must have 'reasonable suspicion' to continue the stop on unrelated grounds."  *Ibid.*  Although officers may conduct investigations unrelated to the stop, they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Rodriguez*, 575 U.S. at 355.  "[A] measure aimed at 'detect[ing]

evidence of ordinary criminal wrongdoing,' . . . is not an ordinary incident of a traffic stop." *Id.* at 355-56 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).

The evidence presented at the hearing plainly establishes that the officers' investigation of Johnson prolonged the traffic stop beyond the time needed to complete the traffic investigation. The driver of the vehicle provided her license and registration information to Officer Leavey promptly at his request.  Meanwhile, Officer Moten observed the occupants of the vehicle from the passenger side.  When Leavey asked if the driver would consent to a search of her vehicle, she declined.   The driver could not produce an unexpired copy of her insurance information immediately, but Leavy apparently was satisfied with the materials he had been provided and returned to his vehicle to review the documents using the patrol car's computer system.  After running the driver's information, he learned that the vehicle was insured.  Leavy Video, at 22:27:20.  It was then that Moten returned the patrol car and informed Leavy about his desire to investigate Johnson.  At that point, the officers' conversation shifted as they developed a plan to remove Johnson from the vehicle; Moten would ask Johnson to step out of the vehicle.  Based on these interactions alone, it is clear that the goals attendant to the traffic stop were complete.  The officers had determined that all of the driver's paperwork was in order.  Although they did not express clearly whether they would issue the driver a warning or a citation for the driving offense, their focus — because of Moten's concerns — had shifted to Johnson.

The government insists that asking Johnson to step out of the vehicle did not prolong the traffic stop because it mattered to their ability to carry out the stop safely.  But the timing of that request contradicts the government's suggestion that such a request was part of the traffic stop itself.  Certainly, an officer may require an individual to exit a vehicle as a safety precaution. *Whitley*, 34 F.4th at 530 (citing *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010)).  But

"safety measures taken to facilitate a different investigation . . . are not tasks incident to the initial stop." *Ibid.* (quoting *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020)). The Sixth Circuit has counseled that the relevant inquiry for determining when a traffic stop morphs into an independent investigation is "'what the police in fact d[id]' and whether it related to the purpose of the traffic stop." *Whitley*, 34 F.4th at 531 (quoting *Rodriguez*, 575 U.S. at 357). Even a *de minimis* extension of a traffic stop is impermissible. *Id.* at 529. "Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." *Rodriguez*, 575 U.S. at 354. And in one recent case, the court of appeals concluded that an officer's initial mission ended when she returned from her patrol to talk to a driver after running his information because "at that point she either could have issued a ticket or allowed" the parties to leave. *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023).

Under that logic, Leavy and Moten's initial mission concluded when they returned to the Saturn for the second time and began their quest to develop reasonable suspicion to prolong the stop to investigate Johnson. When the officers returned to talk to the driver and Johnson, Moten waited for more than a minute before he asked Johnson to leave the car, again undermining the government's contention that it would have been prudent to remove Johnson from the vehicle while the officers completed the process of issuing a ticket or investigating further the driver's insurance. Instead of ordering Johnson to exit the vehicle, Moten peered into the vehicle with his flashlight while Leavy asked the driver contrived questions such as how long she had been driving the vehicle, who paid her insurance, how long the term of her insurance ran, and whether she had a copy of the insurance on her phone. Had the officers been concerned for their safety, they likely would have directed Johnson to exit the vehicle sooner and with greater urgency. At least some of Leavy's inquiries prolonged the stop beyond the length of time necessary, such as his question

about how long the driver had possessed the vehicle. By this time "the traffic stop had morphed into [an unrelated] investigation." *Whitley*, 34 F.4th at 530. The government could not order Johnson from the vehicle without reasonable suspicion.

*Reasonable suspicion.* To demonstrate reasonable suspicion, the government must demonstrate that the officers had some "minimal level of objective justification," looking to the totality of the circumstances. *Ibid.* (quoting *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016)). This justification must be more than an "inchoate and unparticularized suspicion or 'hunch,'" but may be founded on "the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Johnson argues that the officers' investigation was supported by little more than a hunch. In contrast, the government cites several factors encountered by the officers that, it says, collectively amount to reasonable suspicion: the fact that Officer Moten recognized Johnson from a traffic stop several months prior where multiple weapons were discovered near him in a vehicle, the fact that Johnson argued with Moten during the previous stop, and Johnson's demeanor during the present stop. The government emphasizes that Johnson refused to engage Moten in conversation, avoided eye contact, sat with his arms across his waist, leaned forward as if to hide what was on his waist, and declined to exit the vehicle when asked.

The government suggests that these factors should be viewed as a scatterplot of sorts, where the points come together to depict the outlines of an image sufficient to support the officers' reasonable suspicion. Borrowing the analogy, problems with the "points" making up that image immediately are apparent. Consider first Johnson's refusal to exit the vehicle. As noted above, officers are entitled to order vehicle occupants out of the car to further the safety needs of a stop. But as also established, Moten's request that Johnson exit the vehicle at first was just that: a

- 10 -

request.  He did not give Johnson an order.  And that request came far after any safety justification was applicable and as part of the officers' attempt to prolong the stop to investigate Johnson.  Because the officers needed reasonable suspicion to continue their investigation, Johnson's refusal to exit the vehicle when asked cannot itself be credited as a factor.  *Cf. Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

Johnson's demeanor likewise does not provide a strong basis for a finding of reasonable suspicion.  The government maintains variously that Moten was concerned because Johnson did not engage him in conversation, avoided eye contact, kept his arms crossed along his waist, and sat with his upper body learned forward as if to conceal something in his waist area.  It cites as applicable various cases providing that a defendant's "furtive movements" can contribute to reasonable suspicion.  The government is correct that the Sixth Circuit repeatedly has found that "suspicious movements made in response to police presence may properly contribute to an officer's suspicions."  *United States v. McCraney*, 674 F.3d 614, 621 (6th Cir. 2012).  However, the government does not identify precisely what furtive movement Johnson exhibited during the search, and the video footage does not furnish such proof.  Moreover, each of the factors related to Johnson's demeanor identified by the government are more aptly characterized as non-movements.  According to the government, Johnson did *not* talk to Moten, he did *not* look at Moten, "[h]e *kept* his arm tightly bound across his waist, ECF No. 35, PageID.122, and "[h]e *sat* with his upper body leaned forward," *ibid.*  True, while Leavy spoke with the driver, Moten used the words "furtive movement."  Moten Video, at 22:29:32.  What prompted this statement is not apparent, and the video footage shows no movement at all at that time.  Leavy's body camera video

footage shows movement by Johnson earlier in the encounter, but then Johnson was looking through the glovebox to help the driver find her vehicle papers.

The government contends that aspects of Johnson's demeanor appeared unusual, namely the way he was leaned forward in his seat with his hands across his waist, refusing to engage or make eye contact. There is some reason to question these representations. The footage from Moten's body camera does not begin until shortly before the officers' second approach to the vehicle, after the officers already had decided to continue their investigation of Johnson. This is unfortunate because Moten's vantage point would have given him a better perspective on Johnson. Nevertheless, Leavy's camera footage gives some perspective. Johnson does sit still, facing forward, for some of the interaction, as the government describes; that was after he also appears to help search the car's glovebox for the registration and proof of insurance. Leavy Video, at 22:24:00-22:25:10. When Moten's video camera eventually activates upon his second approach to the car, Johnson does appear to be leaned forward somewhat in the passenger's seat, but he clearly can be seen using the phone in his lap and searching the car's glovebox for the insurance information requested by Leavy. Moten Video, at 22:29:14. The same is evident from Leavy's vantage on the other side of the car. Leavy Video, at 22:29:15-22:29:40. Johnson's active use of his hands to help the driver and his involvement in her conversation with Leavy calls into doubt the government's characterization of his demeanor.

It would be one thing if the officers observed Johnson "slouched down in the passenger seat as if to avoid detection and with his hands out of sight"; that behavior might have indicated a concealed weapon and would have raised safety concerns. *See United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008). But there is no suggestion that Johnson made any concerning hand movements other than "ke[eping] his left arm stiff across his lap, pressed against his body," Police

Report, ECF No. 35-2, PageID.132, with his hands in view.  But once more, this characterization remains problematic because Leavy's body camera footage shows Johnson moving his left hand multiple times.  *See* Leavy Video, at 22:24:02, 22:25:04-22:25:25, 22:29:33-22:29-35.  Even if Moten were correct that Johnson's arm placement was suspicious, the Sixth Circuit has warned that officer references to furtive movements should not be credited "cavalierly."  *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006), *abrogated on other grounds by Mathis v. United States*, 579 U.S. 500 (2016).  As courts have warned, "[w]hether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you."  *Ibid.* (quoting *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.)).

We are left then to consider an even more subjective factor of Johnson's demeanor cited by the government: his "refus[al] to engage and avoid[ing] eye contact."  ECF No. 35, PageID.122. Assuming that Johnson had an obligation to engage the officers at all, it is not clear with whom Johnson was supposed to engage and when.  The officers' body camera footage does not capture any attempt by Moten to talk to Johnson during the initial portion of the stop.  From Leavy's camera view, which better captures Johnson's perspective, Moten can be seen aiming his flashlight into the passenger side of the vehicle.  It would be odd for suspicion to be aroused by Johnson's decision not to make eye contact with someone shining a bright light at his face, particularly because he was assisting the driver with her interaction with Leavy.  Moten's first attempt to engage with Johnson — a request for his name — occurred approximately seven minutes into the stop, after the officers returned to the car to follow up on Moten's hunch.  In response to the inquiry, Johnson sat still for a second before turning around to answer Moten.  Moten Video, at 22:28:46.  Moten did not speak to Johnson directly for another minute, then requested him to step

out of the vehicle. *Id.* at 22:29:52. Johnson, again, initially did not react, but when Moten repeated the question, Johnson turned to face him. *Id.* at 22:30:00. The government's characterization of the defendant not engaging with Moten at all is not borne out by the video evidence. True, from that point on, Johnson acted uncooperatively toward Moten, but by then, the officers already were prolonging the traffic stop and needed reasonable suspicion to remove him from the vehicle. Johnson's resistance or refusals to engage with unlawful commands to exit the vehicle cannot be grounds for reasonable suspicion. *Cf. Florida v. Royer*, 460 U.S. 491, 497-8 (1983) (noting that a person approached by an officer "need not answer any question put to him" and "his refusal to listen or answer does not, without more" does not furnish reasonable suspicion); *United States v. Lang*, 652 F. Supp. 3d 820, 833 (E.D. Ky. 2023), *aff'd*, No. 23-5798, 2024 WL 2768354 (6th Cir. May 30, 2024) ("By itself, this refusal would not create reasonable suspicion.").

At the hearing, the government acknowledged that Officer Moten's recognition of Johnson from the encounter two months earlier did not by itself establish reasonable suspicion. It is a factor that may be considered as part of the totality of the circumstances. *See United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). And courts must look at the whole picture, rather than picking apart each factor in a "divide-and-conquer" approach. *See United States. v. Arvizu*, 534 U.S. 266, 273 (2002). At the same time, courts must remember that it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *United States v. Smith*, 263 F.3d 571, 594 (6th Cir. 2001); *United States v. Brown*, 310 F. App'x 776, 783 (6th Cir. 2009) ("It is true that we must view the totality of the circumstances, and that we may find reasonable suspicion based on a combination of factors which by themselves might not create such suspicion. However, in this case we are faced with several reasons that are inappropriate to consider, and a few others that, even taken together, do not amount

to anything more than an unsupportable hunch.").  Here, the factors (many of which are at odds with the record) viewed individually or collectively do not add up to reasonable suspicion that Johnson had been engaged or was about to engage in some sort of criminal activity.

*Escalation of the encounter.*  If the incident had ended there, with Johnson exiting the Saturn, even with the discovery of the firearm, then the result of this motion would favor the defendant.  But two other events of significance occurred: Johnson grabbed Officer Griggs's hand as he reached into the Saturn to unlock the door, and Johnson put the vehicle in Drive attempting to drive off with Griggs's hand through the window.  The government contends that this conduct — which amounted to an assault of the police officer — attenuated any illegality by the police in prolonging the traffic stop without reasonable suspicion.

By now it is well established that the discovery of evidence during an illegal search does not automatically lead to the suppression of the evidence. *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (observing that "the significant costs of th[e] [exclusionary] rule have led us to deem it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs'") (quoting *Hudson v. Michigan,* 547 U.S. 586, 591 (2006)).  To benefit from the exclusionary rule, the defendant must show more than "the mere fact that a constitutional violation was a 'but-for' cause of [the police] obtaining [the] evidence." *Hudson*, 547 U.S. at 592. "[B]ut-for causality is only a necessary, not a sufficient, condition for suppression."  *Ibid.*   "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Ibid.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)) (internal quotation marks omitted).  This so-called attenuation exception to the exclusionary rule permits the government to offer otherwise excludable evidence "when the

connection between unconstitutional police conduct and the evidence . . . has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 579 U.S. at 238 (quoting *Hudson*, 547 U.S. at 593). The Supreme Court has pointed to three factors for assessing attenuation: the temporal proximity between the unlawful act and the discovery of evidence, the presence of intervening circumstances, and the purpose and flagrancy of the government misconduct. *Id.* at 239-41.

The temporal proximity factor favors the defendant. The extended traffic stop and the extrication of the defendant from the Saturn occurred within moments of each other. The Sixth Circuit repeatedly has found discoveries that happen nearly immediately or within the minutes after to support the defendant on this factor. *See United States v. Waide*, 60 F.4th 327, 339 (6th Cir. 2023) (finding encounter that took place in course of an afternoon to weigh in favor of the defendant); *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) (finding no attenuation where "only seconds" had passed between the start of the unlawful seizure and the emergence of the evidence).

Critically, however, the intervening assault of Officer Griggs tips the scales away from the defendant and disqualifies him from invoking the exclusionary rule. A more dramatic illustration of this concept is found in *United States v. Allen*, 619 F.3d 518 (6th Cir. 2010), where the court of appeals held that even if the defendant were correct that the traffic stop in his case was illegal, his response — leading officers on a high-speed chase — was a new and distinct crime that rendered the evidence admissible. *Id.* at 526. The court explained that the defendant's flight "constituted an intervening act that purged the taint of [the defendant's] detention." *Ibid.* (quoting *United States v. Castillo*, 238 F.3d, 424, at *6 (6th Cir. 2000) (table)).

Johnson responds that this line of cases is inapplicable here because he did not violate any law.  That may be true if the only crime applicable to his conduct were, for instance, flight from law enforcement or resisting arrest.  Under Michigan law, a person has "the right to resist unlawful police conduct . . . ."  *People v. Moreno*, 491 Mich. 38, 48, 814 N.W.2d 624, 629 (2012).  The prolonged detention here without reasonable suspicion was unlawful, and Johnson had the right to resist it.  But Johnson did more than resist; he actually assaulted Officer Griggs by grabbing his hand from the interior door lock and attempting to drive off with Griggs's arm in the open window.  Under Michigan law, it is unlawful for an "individual [to] assault[], batter[], wound[], resist[], obstruct[], oppose[], or endanger[] a person who[m] the individual knows or has reason to know is performing his or her duties . . . ."  Mich. Comp. Laws § 750.81d(1).  The right to resist unlawful police conduct — for example by disobeying an order or even fleeing — does not extend to assaulting or battering a police officer.  Johnson's attempt to "pull-off" posed a serious risk to the officers' safety.  *See United States v. King*, 466 F. App'x 484, 489 (6th Cir. 2012) (holding that defendant's flight, which included "numerous violations, including felony fleeing" was an intervening cause that purged taint from initial stop); *United States v. Castillo*, 238 F.3d 424, at *6 (6th Cir. 2000) (table) (noting that defendant's flight at high rate of speed that hit an officer in the leg was an independent crime under Tennessee law).  For that reason, cases like *United States v. Fuller*, 120 F. Supp. 3d 669 (E.D. Mich. 2015), relied upon by the defendant, do not change the calculus.

Finally, the purpose and flagrancy of the official misconduct — a "particularly" significant factor, *Strieff*, 579 U.S. at 239 (quoting *Brown v. Illinois*, 422 U.S. 590, 604 (1975)) — does not strongly favor the defendant when weighed against his act of jeopardizing officer safety.  Here, the officers prolonged the traffic stop without reasonable suspicion attempting to pursue Officer

- 17 -

Moten's hunch that Johnson might be armed.  Their actions were purposeful and intentional.  But their conduct was not especially "flagrant."  *See Strieff*, 579 U.S. at 243 (observing that for the flagrancy factor to favor application of the exclusionary rule, "more severe police misconduct is required than the mere absence of proper cause for the seizure").  And the defendant responded not only by assaulting an officer by grabbing his hand, but also by attempting to drive away with the officer's arm inside the vehicle itself.  That conduct transcended any right that Johnson had to resist unlawful police actions and constituted a serious effort to injure the officer.

\* \* \* \* \*

Although the actions by the Detroit police officers violated the Fourth Amendment by prolonging the detention of the defendant without lawful justification, the defendant's intervening act purged the police conduct of its unlawful taint, disqualifying him from the benefit of the exclusionary rule.  His motion to suppress the seized evidence will be denied.

III.

Johnson also mentions briefly in his motion that the statements he made while in custody in the back of the police vehicle must be suppressed because he was never given his *Miranda* warnings.  He does not specify which statements he believes should be suppressed or the point in the traffic stop beyond which his statements were involuntary.  The government likewise fails to address this argument in its response brief in any detail.

The iconic *Miranda* warnings that must precede police questioning of a person in custody have become enmeshed in our legal culture for nearly six decades.  *Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture.").  Police interrogators must tell a suspect about his right not to incriminate himself, and that if he gives up his right to remain silent,

his statements can be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 492 (1966). Statements made during custodial interrogation without the benefit of *Miranda* warnings are inadmissible in court. *Dickerson*, 530 U.S. at 435.

The defendant's argument, in general, is not well-developed, but it clearly lacks merit. There is no question that Johnson was "in custody" when he vocalized his displeasure with the police while in handcuffs inside the police vehicle. But to trigger a *Miranda* violation, the statements must be the product of interrogation. *United States v. Harris*, 983 F.2d 1069 (6th Cir. 1992) ("Voluntary and spontaneous comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning.") (citing *Cannady v. Dugger,* 931 F.2d 752, 754 (11th Cir.1991)). Interrogation means express questioning or its "functional equivalent," which is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Johnson does not point to any statements made by the officers that were calculated "to elicit an incriminating response . . . ." *Id.* at 301. And even if the officers failed to read Johnson his *Miranda* rights at an appropriate time, he does not identify which of his numerous statements — consisting primarily of approximately ten minutes of profanity directed towards the officers — incriminate him or were in any way elicited by the officers. Johnson's motion to suppress his statements will be denied.

IV.

In a separate motion, Johnson argues that his indictment must be dismissed because the possession of a machinegun is protected by the Second Amendment. He argues that the test announced by the Supreme Court in *New York Rifle and Pistol Association v. Bruen*, 597 U.S. 1

(2022), renders his charge under 18 U.S.C. § 922(o) unconstitutional both facially and as applied to him because it criminalizes the possession of firearms commonly used for self-defense.  He says that machineguns are protected by the Second Amendment's plain text because they are commonly in use for self-defense, pointing to statistics maintained by the Bureau of Alcohol, Tobacco, Firearms, and Explosives suggesting that there are more than 700,000 machineguns lawfully possessed in the United States.  In response, the government points out that machineguns are not in common use because they account for less than .2% of firearms in the United States.

The Second Amendment states that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Despite its plain language, the Supreme Court has determined that the Amendment guarantees an individual right to keep and bear arms irrespective of militia service. *Dist. of Columbia v. Heller*, 554 U.S. 570, 599-600 (2008); *see also Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018).

With certain limited exceptions not applicable here, section 922(o) states that it is unlawful for "any person to transfer or possess a machinegun."  18 U.S.C. § 922(o).  A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b). The term also is defined to include portions "for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  *Ibid.*; *see also Garland v. Cargill*, 602 U.S. 406, 410 (2024).

In *Bruen*, the Supreme Court announced a new test to determine if legislation that regulates the use or possession of firearms offends the Second Amendment.  In that case, the Court struck

down a New York state law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home, finding that the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 597 U.S. 1, 71 (2022). The Court rejected the "two-step" framework most courts of appeals adopted after *Heller*, which "combine[d] history with means-end scrutiny" to assess the constitutionality of regulations impacting Second Amendment rights. *See id.* at 17. Instead, it adopted a new "standard for applying the Second Amendment," *id.* at 24, one solely "rooted in the Second Amendment's text, as informed by history," *id.* at 19. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. Second, when a regulation burdens that conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.*

Does the Second Amendment cover Johnson's alleged conduct? Likely not. Defining the Amendment's scope, the *Heller* court explained that the right "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," a statement reaffirmed by the Court in *Bruen*. *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 21. The Court explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554. U.S. at 625. Although the right extends to bearable arms not existing at the founding, *id.* at 582, "the sorts of weapons protected were those 'in common use at the time,'" *id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). This limitation was justified by the historical tradition regulating the carrying of "dangerous and unusual weapons." *Ibid.* Johnson does not develop an argument that machine guns were in any manner similar to weapons in common use at the time of the founding other than

his contention that many of them are possessed lawfully in the present time and that they are useful for personal defense.

However, circuit precedent prevents even that argument from gaining traction.  Rejecting a post-*Heller* challenge to section 922(o), the Sixth Circuit emphasized that "whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."  *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009).  Courts in this circuit repeatedly have explained that *Bruen* did nothing to upend *Hamblen*'s status as binding precedent.  *United States v. Caldwell*, No. 24-70, 2024 WL 2784340, at *5 (N.D. Ohio May 30, 2024); *United States v. Mitchell*, --- F. Supp. 3d ----, ----, No. 24-9, 2024 WL 2272275, at *3 (N.D. Ohio May 20, 2024); *United States v. Wilson*, No. 23-20081, 2023 WL 8288989, at *5 (W.D. Tenn. Nov. 7, 2023); *United States v. Sturgeon*, No. 23-6, 2023 WL 6961618, at *3 (E.D. Ky. Oct. 20, 2023); *United States v. Smith*, No. 23-28, 2023 WL 6880423, at *2 (E.D. Ky. Oct. 18, 2023).  This Court is bound by circuit precedent, and Johnson offers no good explanation for why the Court should vary from the holdings of other district courts that *Hamblen* remains good law.

Moreover, the defendant's arguments consistently have been rejected by the many courts nationally that have considered the constitutionality of section 922(o).  The federal appellate courts to consider the issue after *Heller* uniformly have concluded that these weapons do not warrant constitutional protection because they are not commonly used and are dangerous and unusual.  *E.g.*, *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 142 (3d Cir. 2016) ("[W]e repeat today that the Second Amendment does not protect the possession of machine guns."); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns are dangerous and unusual and therefore not in

common use.  They do not receive Second Amendment protection."); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("We agree with the reasoning of our sister circuits that machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment."); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Accordingly, under *Heller*, Fincher's possession of the guns is not protected by the Second Amendment."); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) ("[T]he Second Amendment does not protect Zaleski's personal possession of machine guns.").  Similarly, after *Bruen*, the consensus among district courts remains that machineguns are not covered by the plain text of the Second Amendment.  *See Mitchell*, 2024 WL 2272275, at *5 (collecting cases); *see also United States v. Cousar*, No. 23-10004, 2024 WL 1406898, at *13 n.103 (D. Kan. Apr. 2, 2024) (collecting cases); *United States v. Lane*, 689 F. Supp. 3d 232, 252 (E.D. Va. 2023); *United States v. Simien*, 655 F. Supp. 3d 540, 553 (W.D. Tex. 2023).

Johnson argues that section 922(o) is facially unconstitutional, a "difficult challenge," *United States v. Salerno*, 481 U.S. 739, 745 (1987), where he "must establish that *no set of circumstances* exists under which the [statute] would be valid," *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *Salerno*, 481 U.S. at 745); *see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, --- S. Ct. ----, 2024 WL 3089532 (U.S. June 24, 2024) (mem.).  His primary argument is that machineguns are commonly used for self-defense, as ATF data fixes the number possessed lawfully at more than 700,000.  He draws primarily on Justice Alito's concurrence in *Caetano v. Massachusetts*, which concluded that the state's categorical ban on stun guns was unconstitutional due to the wide ownership of the device.  577 U.S. 411, 420 (2016) (Alito, J., concurring).  He also cites as

applicable an Eastern District of New York case that reasoned similarly with regard to nunchaku. *See Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018).

A court in this circuit recently rejected a nearly identical argument, pointing out that Justice Alito's reasoning did not secure a majority of the Court and that *Caetano* concerned a weapon designed to be *non-lethal*, something that cannot be said for machineguns. *See Mitchell*, 2024 WL 2272275, at *4. The rationale adopted by the majority of the Court did not address whether stun guns were "dangerous and unusual" or "in common use." *Ibid.* This rejoinder is persuasive. It also is worth observing that the ATF data relied on by Johnson indicates only the number of machineguns lawfully possessed in the United States; it demonstrates little about whether those weapons are owned by private individuals or used for self-defense or are otherwise akin to the "sorts of weapons . . . 'in common use at the time' . . . of the Second Amendment's ratification." *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). Nor is a machinegun easily analogizable to the "quintessential self-defense" use of handguns cited in *Heller* as an important characteristic placing them within the Second Amendment's scope. *Id.* at 629.

The Court has not located a case that holds that machineguns fall within the Second Amendment scope except for one, *United States v. Morgan*, No. 23-10047, 2024 WL 3936767 (D. Kan. Aug. 26, 2024), which fairly can be characterized as an outlier. That court held that section 922(o) was unconstitutional as applied to a "Anderson Manufacturing, model AM-15 .300 caliber machinegun" and a Glock switch. The court applied the *Bruen* framework's first step by dismissing the Supreme Court's statement in *Heller* that the Second Amendment does not protect the possession of "dangerous and unusual weapons" as mere *dictum*. 2024 WL 3936767, at *2. That court also reasoned that the Second Amendment could apply to "arms that did not exist at the country's founding." *Ibid.* Turning to *Bruen*'s second step, the court proceeded to reject the

examples of historical regulation offered by the government, finding historical laws that restricted "going armed with dangerous weapons" and similar formulations as inapplicable to a defendant's mere possession of the weapons charged in the indictment. *Id.* at *3. Finally, the court stated that even if the Second Amendment would allow the prohibition of such weapons on the ground that they are dangerous and unusual, the fact that "[t]here are over 740,000 legally registered machineguns in the United States today" suggests that they are not so unusual. *Id.* at *4.

*Morgan* conflicts with the weight of substantial authority. No other case reaches a similar conclusion, and neither party points to any other. And the decision employs a logical construct which is, respectfully, flawed. Initially, the decision proceeds from the premise that a Glock switch is a bearable arm. *See id.* at *2 n.1. The court explained that the switch is "an integral component of what makes the Glock to which it is attached a machinegun." *Ibid.* But this assumes the conclusion. *Heller* clarified that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Surveying historical dictionaries, the *Heller* court defined "arm" as "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (alteration in original) (citations omitted). By its own terms, a Glock switch is *not* a weapon. It is a component of a weapon. The Supreme Court has not weighed in on the scope of Second Amendment protections due weapons components, but several courts have drawn a distinction between components necessary for the weapon to function as such and components that are not. *See*, *e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); *United States v. Saleem*, 659 F. Supp. 3d 683, 697 (W.D.N.C. 2023)

("[S]ilencers, because they are not independently operable and do not serve any central self-defense purpose, are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection."); *United States v. Berger*, 715 F. Supp. 3d 676, 702 (E.D. Pa. 2024) (citing *Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Atty. Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018)); *United States v. Lightner*, No. 24-21, 2024 WL 2882237, at *2 (M.D. Fla. June 7, 2024); *Arms v. City of Chicago*, No. 10- 4257, 2024 WL 3495010, at *9 (N.D. Ill. July 22, 2024) (holding that laser sights are not arms).  A Glock switch itself is not an integral component of a firearm.  *United States v. Alsenat*, No. 23-60209, 2024 WL 2270209, at *9 (S.D. Fla. May 20, 2024) ("Given the above historical definitions, an MCD, possessed by itself, is not an 'Arm' protected by the Second Amendment.  An MCD by itself is not a 'weapon of offence' or 'any thing that a man . . . useth in wrath to cast at or strike another.'").  As a *mere* component, designed to modify the weapon's firing, the Glock switch is not a protectable firearm.  Without a switch, a Glock still is a Glock and fires as any other handgun.  It is no answer to say that a Glock is only functional as a machinegun because of a Glock switch.  With or without the switch, the device still is functional as a firearm, and the switch merely enhances the rate of fire.

That problem aside, *Morgan*'s rejection as mere *dictum* of the Supreme Court's repeated statements that the Second Amendment does not extend to dangerous or unusual weapons is no North Star for district courts.  "Lower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale."  *In re Baker*, 791 F.3d 677, 682 (6th Cir. 2015) (quoting *Am. Civ. Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 447-48 (6th Cir. 2010)).  The Supreme Court has made it abundantly clear that the Second Amendment only protects the right to possess weapons "in common use" at the time of the founding.  *Heller*, 554 U.S. at 627 (quoting

*United States v. Miller*, 307 U.S. 174, 179 (1939)).  It grounded this limitation in "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Ibid.* (internal quotation omitted). And it emphasized that it would be "startling" to read its precedents to suggest that restrictions on machineguns would be unconstitutional.  *Id.* at 624.  *Morgan*'s conclusion that machineguns and their components should be assessed at *Bruen*'s step-two ignores *Bruen* itself, which adopts *Heller*'s "dangerous and unusual" language as the threshold question of whether the Second Amendment's plain text covers the conduct at issue.  *Bruen*, 597 U.S. at 21.

But even assuming *Morgan* is correct that the possession of a machinegun conversion device (not the gun itself) falls within the plain text of the Second Amendment, the court erred by disregarding too quickly the historical analogs offered by the government in support of the statute. "[W]hen a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *United States v. Rahimi*, 602 U.S. ---, ---, 144 S. Ct. 1889, 1898 (2024) (quoting *Bruen*, 597 U.S. at 30).  "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Ibid.*  The *Morgan* court rejected the government's reliance on historical laws forbidding "going armed with dangerous weapons," stating that they were inappropriate analogs to section 922(o)'s bar on possession.  But this is the sort of overly restrictive analysis the Supreme Court warned against in *Bruen* and *Rahimi*.  And at least one of the sources cited by the government, Blackstone's Commentaries on the Laws of England, was cited by the Supreme Court in support of the general proposition that the Second Amendment's protections do not extend to dangerous and unusual weapons.  *Heller*, 554 U.S. at 627; *Bruen*, 597 at 21.  It would be logically inconsistent for this source to be persuasive evidence of that proposition but not persuasive enough to suggest

that the government may impose a blanket ban on the possession of dangerous and unusual weapons.

Finally, *Morgan* does little to grapple with whether machine guns and associated components are dangerous and unusual, simply observing that the ATF data discussed above suggesting that there are many held lawfully.  *Morgan*, 2024 WL 3936767, at *4.  However, the opinion does not address that many of these are collector items rather than in common use for self-defense, *Bruen*, 597 U.S. at 32, and proportionally represent a small fraction of the total firearms possessed by the public.

Because *Morgan*'s analysis is flawed, the Court must reject it as an outlier.  *United States v. Chan*, No. 22-00109, 2024 WL 4028019, at *6 n.16 (D. Haw. Sept. 3, 2024).  It is of no support to the defendant in this case.

Because the possession of machineguns may be regulated consistently with the Second Amendment, the defendant has not demonstrated that there are *no examples* where the statute would be valid, and his facial challenge must fail.   The defendant's as applied challenge fails as well, because the Second Amendment plainly *does not* protect the possession of machineguns, and the defendant's common use arguments are unpersuasive.  He offers no other explanation for why it would be unconstitutional to enforce the statute's bar on the possession of machineguns against him.  He does not suggest that the weapon discovered by the arresting officers does not qualify as a machinegun under the statute.  Nor does he argue that his situation meets the criteria covered by either of the two statutory carveouts.  *See* 18 U.S.C. § 922(o)(2) (noting that the provision does not apply to those possessing the weapons under the authority of a government entity or the possession of a machinegun lawfully possessed before 1986).

V.

The defendant has not shown that the firearm seized during the traffic stop on December 6, 2023 should be excluded from evidence at trial by the application of the exclusionary rule that otherwise would be employed to enforce Fourth Amendment violations.  He has not shown that the statements he made while in custody at that time were obtained in violation of the Fifth Amendment.  Finally, the defendant has not demonstrated that 18 U.S.C. § 922(o) is unconstitutional on its face or as applied to him.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence (ECF No. 28) is **DENIED**.

It is further **ORDERED** that the defendant's motion to dismiss the indictment (ECF No. 29) is **DENIED**.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:  October 29, 2024